**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| MICHAEL SHIPTON, | * | |
| Plaintiff, | * | |
| v. | * | Case No.:  1:20-CV-01926-LKG |
| BALTIMORE GAS & ELECTRIC COMPANY, et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### PLAINTIFF'S MEMORANDUM OF LAW OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

Plaintiff Michael Shipton ("Plaintiff" or "Mr. Shipton"), by and through his undersigned counsel, respectfully submits this Memorandum of Law in Opposition to the Motion for Summary Judgment filed by Defendants Baltimore Gas & Electric Company ("BGE"), Exelon Corporation, Exelon Business Services Company, Michael Grosscup ("Grosscup"), Edward Woolford ("Woolford"), Jeanne Storck ("Storck"), and Bindu Gross ("Gross") (collectively, "Defendants") and Cross-Motion for Summary Judgment in his favor and in support thereof states as follows.

### INTRODUCTION

Defendants claim that Mr. Shipton's interference and retaliation claims under the Family and Medical Leave Act ("FMLA") fail because BGE terminated his employment based on its "honest belief" that he misused his leave and submitted conflicting medical documentation. Throughout this litigation, Defendants have taken the position that Mr. Shipton made up that he was taking FMLA leave due to neuropathy after realizing that using FMLA leave for

hypoglycemia jeopardized his commercial driver's license ("CDL").  Of course, that is a deliberate lie.  BGE's own business records prove that Mr. Shipton had been experiencing symptoms of neuropathy since 2017 and, in fact, he truthfully reported that he was using FMLA leave for neuropathy.  Moreover, it is undisputed that neuropathy is a complication of diabetes, the very condition for which Mr. Shipton was approved to take FMLA leave.  Despite Defendants' actual knowledge of all of these facts based on the extensive documents and information gathered and reviewed in the course of their own investigation into Mr. Shipton's FMLA usage, Defendants have persistently feigned confusion about Mr. Shipton's health situation and falsely claimed that they believed that he misused his sick leave when, in fact, they knew and, ultimately, conceded, that he did not lie about the reasons that he took leave.

In the end, Defendants are not entitled to summary judgment because there is zero evidence that Mr. Shipton improperly used his FMLA leave.  There is zero evidence that he used FMLA leave to extend his weekends.  There is zero evidence that he took leave to which he was not entitled.  There is zero evidence that he used either FMLA leave or sick leave when he was not actually sick and unable to perform one or more essential functions of his job.  And, Mr. Shipton going on vacation after taking FMLA leave is not inherently suspicious since one can be physically incapable of lifting 100-pound equipment while still being capable of sitting on the beach in Jamaica.  Finally, given the undisputed evidence that Defendants discharged Mr. Shipton when they knew he was entitled to take FMLA leave, this Court should award summary judgment in favor of Mr. Shipton on the issue of Defendants' interference with his FMLA rights.

## STATEMENT OF FACTS

Mr. Shipton was diagnosed with diabetes in or around 2003.  (J.R. 0014, Exhibit 1: Shipton Transcript at 40:16-41:2.)  As a result of his diabetes, he suffers from diabetes-related symptoms,

conditions and complications such hypoglycemia or low blood sugar, hyperglycemia or elevated blood sugar, weakness and fatigue, and neuropathy, which is a common symptom or complication of diabetes in which nerves are damaged as a result of hyperglycemia or high blood sugar levels. (J.R. 0014 (Ex. 1) at 41:3-41:21; 47:1-49:14; 49:15-50:3; J.R. 0240, Exhibit 22:  Texts Between Shipton and Grosscup From 9/24/17 To 6/8/18.)   Further, because his immune system is compromised as a result of those conditions, he is more susceptible to illnesses like digestive problems, the common cold, and viruses, and he is more likely to have complications and/or a more serious case of these illnesses.  (J.R. 0014 (Ex. 1) at 92:13-93:2.)

Mr. Shipton started working at BGE as a Utility Trainee in the underground gas department in March 2014.   (Joint Statement of Undisputed Facts ("JSOF") at ¶ 4; J.R. 0015 (Ex. 1) at 53:3-53:5.)   After successfully completing utility training, he progressed from a Trainee to an Underground Gas Mechanic B position, and he remained in that role until he was discharged on June 26, 2018. (JSOF at ¶ 2.)   The underground gas mechanic position is a physically demanding job and "probably the most physical in BGE," and involves "a lot of heaving lifting, shoveling, digging holes, backfilling, carrying heavy equipment" and "most days extended long past eight hours" since they "were on emergency crews." (J.R. 0059 (Ex. 1) at 228:1-21.)   According to the job description, the physical demands of the job frequently required the employee to bend, squat, and crouch, to lift anywhere from 25 to 100 lbs., and was contingent on passing a "strenuous physical and respirator exam."  (J.R. 0226-0229, Exhibit 19: Job Description.)

Mr. Shipton's supervisor during utility training was Mark Murphy.  (J.R. 0021-0022 (Ex. 1) at 77:15-78:1.)  He then briefly reported to Joseph Soper in/around 2016.  (J.R. 0020-0024 (Ex. 1) at 73:11-74:2; 88:1-88:6.)   Next, he reported to John Lang.  (J.R. 0020 (Ex. 1) at 73:2-73:10.) Michael Grosscup was his supervisor from 2017 until discharge.  (J.R. 0020 (Ex. 1) at 72:16-73:1)

Throughout Mr. Shipton's employment with BGE, he periodically missed work due to his diabetes, diabetes-related conditions and complications, and medical appointments for those conditions.  For example, in March 2016, he was absent from work for sinusitis.  (J.R. 0023 (Ex. 1) at 84:10-84:18.)  On September 25, 2017, Mr. Shipton called out due to nerve pain in his leg.  (J.R. 0240 (Ex. 22).)  On January 2, 2018, he missed work for a doctor's appointment with a specialist.  (J.R. 0260, Exhibit 23:  Summary of Texts Between Shipton and Grosscup From 1/1/18 to 6/8/18.)  Mr. Shipton told his supervisors and his manager that nearly all of his absences related to his diabetes, diabetes-related conditions and complications and medical appointments related to those conditions.  (J.R. 0024-0026 (Ex. 1) at 87:21-88:6; 91:20-92:9; 93:10-93:16; 93:20-94:3; 94:9-94:13; 94:21-95:7.)  However, no information was provided to him regarding his right to use intermittent FMLA for those absences for nearly two years.

At the same time, Mr. Shipton's supervisors proceeded to give him poor performance reviews, which negatively impacted his promotional opportunities and compensation, based on absences they knew or should have known qualified for coverage under the FMLA.  For instance, when Mr. Shipton progressed from a utility trainee to a mechanic B, he received a smaller salary increase than the other trainees who were in his utility training class.  (J.R. 0026 (Ex. 1) at 97:1-97:18.)

In early 2016, Mr. Shipton received his annual performance review for 2015, which criticized him for his absenteeism.  (J.R. 0024 (Ex. 1) at 85:18-85:21; 86:4-86:21; 88:16-89:4.)  Mr. Shipton complained to his supervisor that all of his absences related to his health condition.  (J.R. 0020-0026 (Ex. 1) at 73:2-74:2; 77:15-77:20; 96:1-96:14.)  However, no information was provided to Mr. Shipton regarding his rights under the FMLA.

In January 2017, Mr. Shipton received his annual performance review for 2016, which

4

again criticized him for his pattern of absences.  (J.R. 0027 (Ex. 1) at 99:20-100:20; 101:5-101:8.)  Although Mr. Shipton received a satisfactory performance rating, as a result of the criticism regarding his attendance he did not receive a step increase and his bonus was reduced.  Mr. Shipton complained to Grosscup, who had recently become his supervisor.  (J.R. 0020-0029 (Ex. 1) at 72:16-73:1; 94:9-94:13; 105:4-106:9.)  However, Grosscup just pointed out that the comments were made by his former supervisor and said, "Don't shoot the messenger.  I didn't write this, this is from John." (J.R. 0029 (Ex. 1) at 106:7-106:9.)  Again, no information was provided to Mr. Shipton regarding his rights under the FMLA.

In March 2017, Mr. Grosscup unilaterally reassigned Mr. Shipton from a three-man crew to a two-man crew working with a Crew Leader in his 60s and that remained his crew for the remainder of his employment.  (J.R. 0029-0030 (Ex. 1) at 109:7-110:17.)  Due to the smaller size of his new crew as well as the advanced age of his new Crew Leader, Mr. Shipton's workload increased and his job duties became more physically demanding, which exacerbated his health issues. (J.R. 0030 (Ex. 1) at 109:20-110:2.)

In 2017, Mr. Shipton's diabetes was uncontrolled, his sugars were fluctuating, and he randomly had episodes of hypoglycemia, and after his medications were changed he started having "a lot of dips" when he "was having low blood sugars" and "felt weak, tired," and "drained." (J.R. 0032 (Ex. 1) at 119:18-120:18.)  During episodes of hypoglycemia and as a result of his diabetes in general, Mr. Shipton suffered from "the sweats and the shakes," "feeling flushed" and "drained," weakness, nausea, and headaches and was unable to perform any of the essential functions of his job.  (J.R. 0032-0034 (Ex. 1) at 121:18-123:10; 129:1-5.)

By mid-2017, Mr. Shipton had nearly exhausted his annual sick leave allotment.  (J.R. 0026 (Ex. 1) at 95:8-95:13.)  For the first time, Mr. Grosscup informed Mr. Shipton that he could

apply for intermittent FMLA leave for his diabetes-related absences.  (J.R. 0026 (Ex. 1) at 95:10-95:18.)

Mr. Shipton submitted the necessary paperwork to take intermittent FMLA leave related to his diabetes in or around July 2017.  (J.R. 0109-0112, Exhibit 3: Letter Dated 7/25/17 and FMLA Eligibility Notice and Notice of Rights; J.R. 0113-0120, Exhibit 4: FMLA Request Form and Certification From Hamershock Dated 8/18/17.)  The paperwork completed by his primary healthcare provider, Chelsey Hamershock, P.A., indicated that he needed unscheduled intermittent leave for up to 3 consecutive calendar days 1-2 times per month for episodes of incapacity due to flare-ups.  The paperwork specifically stated that Mr. Shipton needed the leave because he is a diabetic and often experienced episodes of hypoglycemia during which he was unable to perform any of the essential functions of his job.[1]  On August 25, 2017, Mr. Shipton received written notice that his FMLA request had been approved.  (J.R. 0121-0122, Exhibit 5: Letter, FMLA Designation Notice and Instructions for Intermittent or Reduced Schedule FMLA Leave From 8/18/17 Through 2/18/18.)  There is nothing in the FMLA paperwork stating that Mr. Shipton's FMLA approval was for hypoglycemia only.  To the contrary, the paperwork plainly indicated that he should report all absences for this condition as FMLA leave.  Further, Mr. Shipton understood that his FMLA approval covered any absences related to his diabetes, including, but not limited to, episodes of hypoglycemia, neuropathy, and severe colds and infections.   (J.R. 0034-0036 (Ex. 1) at 126:127:10; 137:15-137:19.)

---

[1] Ms. Hamershock is a Physician's Assistant who worked under the supervision of a physician.  (J.R. 0031 (Ex. 1) at 115:12-116:5)  By that time, she had been treating Mr. Shipton for approximately two years and treated him "many" times for his diabetes.  (J.R. 0032 (Ex. 1) at 121:1-121:17.)  Ms. Hamershock and Mr. Shipton did not discuss what he needed the certification for or what she was going to write on the certification.  (J.R. 0032-0034 (Ex. 1) at 120:19-120:21; 126:3-126:16.)  Rather, Ms. Hamershock just wrote a generalized description of the most common symptoms associated with hypoglycemia and diabetes.  (J.R. 0033 (Ex. 1) at 122:2-122:10.)

Mr. Shipton also submitted the necessary paperwork to reapply to use intermittent FMLA leave for his diabetes-related absences in or around December 2017.  (J.R. 0127-0130, Exhibit 6: Letter Dated 12/21/17, FMLA Eligibility Notice and Notice of Rights;  J.R. 0131-0135, Exhibit 7: FMLA Certification From Hamershock Dated 1/2/18.)  On January 5, 2018, Mr. Shipton received written notice that his FMLA request had been approved.  (J.R. 0136-0142, Exhibit 8: Letter, FMLA Designation Notice, and Instructions for Intermittent or Reduced Schedule FMLA Leave From 1/2/18 Through 7/2/18, and FMLA Tracking/Coding Obligations Supervisor Notification to Grosscup.)[2]

In February 2018, Mr. Shipton received his annual performance review for 2017.  (J.R. 0037 (Ex. 1) at 138:5-138:13; J.R. 0143-0149, Exhibit 9: 2017 Performance Review.)  Although he received a cost-of-living adjustment, he did not receive a step increase and his bonus was reduced due to his attendance.  (J.R. 0038 (Ex. 1) at 142:2-142:9; JSOF at ¶ 16; J.R. 0246 (Ex. 22); J.R. 0260 (Ex. 23).)  Mr. Shipton complained a few times to Grosscup, but Grosscup just said, "you got to show up, you got to be here more, you're missing too many days. Nothing I can do about it." (J.R. 0039 (Ex. 1) at 147:10-147:19.)  Notably, Mr. Shipton's only attendance issue was absences related to his health condition.  However, the performance review incorrectly stated that he had a problem with lateness as well.

Mr. Shipton then complained to the Manager for Gas Construction and Maintenance, Edward Wolford, who was Mr. Shipton's second level supervisor or manager at all relevant times. (J.R. 0021-0026, 0038 (Ex. 1) at 74:3-74:15; 94:21-95:7; 144:19-145:19.)  He pointed out that he volunteered to work weekends and that his Crew Leader was a top producer and had received an excellent performance review and questioned how his supervisors could reconcile his poor

---

[2] At that time, Mr. Shipton still experienced occasional episodes of hypoglycemia. (J.R. 0036 (Ex. 1) at 134:6-134:13.)

performance review with his Crew Leader's outstanding production, but Wolford just responded, "how do I know Tony's production isn't going up and skyrocketing when you're not here?"  (J.R. 0038-0039 (Ex. 1) at 145:4-145:19; 148:5-148:19.)

Mr. Shipton also complained to Human Resources.  (J.R. 0029, 0038 (Ex. 1) at 106:11-108:16; 142:14-143:21.)  He specifically advised his Human Resources Business Partner, Jeanne Storck, that his performance review was unfair because the poor rating was based solely on his absences due to his medical issues. (J.R. 0029, 0038 (Ex. 1) at 108:5-108:13; 143:6-143:12.) Storck said she would speak with his supervisor.  (J.R. 0029, 0038 (Ex. 1) at 108:14-108:16; 143:13-143:15.)  However, Mr. Shipton heard nothing further about the issue from either Storck or Grosscup.  (J.R. 0029, 0038 (Ex. 1) at 108:14-109:6; 143:16-143:21.)   Mr. Shipton's performance review remained unchanged.

Although Mr. Shipton already had occasional bouts of nerve pain in 2017, he began to experience severe foot pain on a daily basis in 2018.  (J.R. 0014-0015 (Ex. 1) at 49:19-53:2.)  His primary healthcare provider, Chelsey Hamershock, P.A., referred him to a specialist, endocrinologist Preethi Kadambi, M.D., for further treatment related to his diabetic neuropathy. (J.R. 0014-0015 (Ex.1) at 49:20-50:3.)  Dr. Kadambi prescribed Lyrica for his diabetic neuropathy, which significantly reduced the frequency and intensity of his symptoms.  (J.R. 0015 (Ex. 1) at 50:14-52:10.) However, prior to being prescribed Lyrica, Mr. Shipton frequently suffered sudden attacks of neuropathy pain, which he describes as "stabbing pains in the bottom of my feet or my calf" that caused his toes to "curl" and his calves to "cramp up."  (J.R. 0015 (Ex. 1) at 52:11-53:2.)

When Mr. Shipton called out of work, he was required to notify his immediate supervisor at least one (1) hour before the start of his shift.  He also was required to notify Exelon's Absence Reporting Center.  (J.R. 0024-0025, 0035 (Ex. 1) at 89:15-90:10; 136:2-136:21.)  Although BGE

policy states that employees must personally speak with their immediate supervisor when providing notice of their absences, most supervisors directed their subordinates to text them regarding any absences. (J.R. 0025 (Ex. 1) at 90:5-90:9.)   Mr. Shipton usually notified his immediate supervisor of the specific reasons for his absences via text message.  (J.R. 0025 (Ex. 1) at 91:15-91:19.)  Although he was not generally required to notify Exelon's Absence Reporting Center of the specific reasons for his absences, he often did so.  (J.R. 0025, 0035 (Ex. 1) at 91:4-91:14; 136:2-136:21.)  With respect to FMLA leave in particular, he was only required to say that it was an FMLA-covered absence.  (J.R. 0035 (Ex. 1) at 136:8-137:14.)[3]

For instance, on March 5, 2018, Mr. Shipton used intermittent FMLA leave for foot pain from neuropathy.  (J.R. 0247 (Ex. 22); J.R. 0260 (Ex. 23).)   Mr. Shipton notified his immediate supervisor, Grosscup, that he was having foot issues and that he was using FMLA for this absence. (JSOF at ¶ 17; J.R. 0247 (Ex. 22); J.R. 0260 (Ex. 23).)  In April 2018, the week before Mr. Shipton was scheduled to be off from work for a planned vacation, he developed severe foot pain from diabetic neuropathy again and used three (3) days of intermittent FMLA leave.  (J.R. 0039-0040 (Ex. 1) at 148:20-150:5.)  As a result of calling out three days before he was scheduled to leave for vacation, on April 6, 2018, Mr. Shipton was directed to report to BGE's Occupational Health Services ("OHS") department for an evaluation.  (JSOF at ¶ 18.)  During that evaluation, Mr. Shipton disclosed that his recent absences were due to severe foot pain from diabetic neuropathy, that he was unable to tolerate pain in his feet while standing for long periods of time, and that he used FMLA leave for his absences due to neuropathy. (JSOF at ¶ 18; (J.R. 0040 (Ex. 1) at 151:9-151:17.)

---

[3] Mr. Shipton occasionally was asked for the condition "number" but, after he explained that he didn't have or know of any condition number, he was told "don't worry about it."  (J.R. 0035 (Ex. 1) at 136:8-137:10.)

The next day, Mr. Shipton traveled to Jamaica for vacation.  (JSOF at ¶ 18; J.R. 0040 (Ex. 1) at 151:20-151:21.)  Following Mr. Shipton's vacation, he was directed to report to BGE OHS again on April 19, 2018.  (JSOF at ¶ 20.)  When Mr. Shipton reported to OHS, he was informed that his commercial driving privileges had been suspended and that he would no longer be allowed to drive a commercial vehicle due to some of the symptoms listed in his FMLA paperwork.  (J.R. 0040-0041 (Ex. 1) at 153:12-155:2.)  Mr. Shipton explained that he was not experiencing those symptoms and that at that time his primary issue was foot pain due to diabetic neuropathy.  (J.R. 0041 (Ex. 1) at 154:10-154:14.) The same day, BGE OHS sent Woolford a letter memorializing the suspension of Mr. Shipton's driving privileges.  (J.R. 0230, Exhibit 20: Letter to Woolford.)

By that time, Mr. Shipton felt he was being pressured by both his supervisors and BGE OHS to limit or reduce the number of days he took FMLA leave.  (J.R. 0052 (Ex. 1) at 160:6-160:10; 198:13-198:19.)  Once when he returned to work from a recent absence, coworker Drew Simmons ("Simmons") warned him that Grosscup had played one of his call-out messages in front of Simmons and other coworkers, laughed about it, and said that Mr. Shipton should be fired.  (J.R. 0051 (Ex. 1) at 196:21-197:18.)  Mr. Shipton contemporaneously reported what Simmons told him to coworker and union steward David Waldhauser ("Waldhauser").  (J.R. 0052 (Ex. 1) at 198:1-200:6.)  In addition, coworker James Vaughn ("Vaughn") warned Mr. Shipton that when he was absent Grosscup had an attitude towards him and made comments complaining about him being "off again."  (J.R. 0053 (Ex. 1) at 203:19-205:6.)

On April 25, 2018, Mr. Shipton submitted paperwork from his endocrinologist, Preethi Kadambi, M.D., substantiating that he needed to use intermittent FMLA leave for diabetic neuropathy.  (J.R. 0150-0158, Exhibit 10:  Letter, FMLA Eligibility Notice and Notice of Rights, and Certification From Kadambi Dated 5/2/18.)   The paperwork completed by Dr. Kadambi

indicated that he needed unscheduled intermittent leave for up to 2 consecutive calendar days every 3-6 months for episodes of incapacity due to flare-ups preventing him from performing his job functions.  The paperwork indicated that she saw Mr. Shipton on March 12, 2018 and April 26, 2018, that she prescribed him medication.  The paperwork stated that Mr. Shipton needed the leave because he had "peripheral neuropathy with symptoms of numbness, tingling, and burning sensation" but he had "no loss of sensation on [her] exam on 4/26/18 and [was] able to identify joint position" and thus it would "not cause impairment in his job."  The paperwork also stated that Mr. Shipton had "not had any episode of hypoglycemia since he first saw" her and that his "blood sugars ha[d] significantly improved with treatment."

Mr. Shipton also submitted a separate letter from Dr. Kadambi confirming that he could safely drive a commercial vehicle.  The letter stated: "I have been seeing Mr. Shipton for diabetes care since March 2018. He has reasonably well controlled diabetes—blood sugars have improved significantly.  He has symptoms of peripheral neuropathy but no loss of sensation or joint position sense.  He has not had any hypoglycemia since he first saw me.  I understand the function and demands of commercial driving to the extent described by the patient."  (J.R. 0159, Exhibit 11: Letter Dated 5/3/18.)

On May 23, 2018, Mr. Shipton received written notice that his FMLA request had been approved.  (J.R. 0231-0239, Exhibit 21: Letter, FMLA Designation Notice, Instructions for Intermittent or Reduced Schedule FMLA Leave From 4/19/18 Through 10/18/18, and the FMLA Tracking/Coding Obligations Supervisor Notification and Email to Grosscup Dated 5/23/18.)

However, BGE OHS advised Mr. Shipton that the documentation he submitted from Dr. Kadambi regarding his CDL privileges was insufficient and that he had to obtain updated paperwork from Ms. Hamershock. (J.R. 0042-0044 (Ex. 1) at 158:9-159:2, 167:9-168:19; J.R. 0249-0251 (Ex. 22); J.R. 0260 (Ex. 23).)  Mr. Shipton did as he was directed and submitted a letter

from Ms. Hamershock confirming that he could safely drive a commercial vehicle.  (J.R. 0044-0045 (Ex. 1) at 167:1-170:8.) Specifically, the letter from Hamershock stated, "In January of 2018, we updated his FMLA papers to cover him for diabetic-related complications. However, he has not experienced and complications of the disease. There have been no reported hypoglycemic events in over 2 years. He does not experience any blurred or double vision, paresthesias, dizzy /clammy, sweaty, shaky, headaches, nausea, or vomiting. He has never as a result of his diabetes or otherwise experienced a seizure, loss of consciousness, required assistance of another individual, or experienced a period of impaired cognitive function that occurred without warning. Mr. Shipton has not had recurring (2 +) disqualifying hypoglycemic reactions within 5 years as listed in FMCSA guidelines." (J.R. 0160, Exhibit 12: Letter Dated 5/30/18.)

On Monday, June 4, 2018, Mr. Shipton notified Grosscup via text message that he was sick and unable to work.  (J.R. 0254 (Ex. 22); J.R. 0261 (Ex. 23).)  He specifically disclosed that the day before he woke up with a severe sore throat, that he sought treatment at an urgent care facility, and that he was diagnosed with strep throat.   On Tuesday, June 5, 2018, Mr. Shipton notified Grosscup via text message that he was still sick and unable to work and provided a picture of the doctor's note provided by the urgent care facility.  (J.R. 0255-0256 (Ex. 22); J.R. 0261 (Ex. 23).) On the morning of Wednesday, June 6, 2018, Mr. Shipton notified Grosscup via text message that he sought treatment at the urgent care facility again and provided a picture of the doctor's note provided by the urgent care facility.  (J.R. 0258 (Ex. 22); J.R. 0262-0263 (Ex. 23).)  He notified Grosscup that he had been cleared to return to work on Friday, June 8, 2018.  He also volunteered to work that weekend. On Thursday, June 7, 2018, Mr. Shipton finally received confirmation that he had been cleared to resume driving.  (J.R. 0259 (Ex. 22).)  Mr. Shipton texted the information to Grosscup and reminded him that he would be returning to work the next day and Grosscup sent

him a reply text advising that he needed to report to work an hour early to attend a fact-finding meeting.  (J.R. 0259 (Ex. 22).)

On June 8, 2018, Mr. Shipton participated in a fact-finding interview with Storck, Labor Relations Principal Bindu Gross, and Union Representative Gerry Werner.  (JSOF at ¶ 26; J.R. 0047 (Ex. 1) at 178:18-179:9.)  Storck and Gross said the meeting was regarding his FMLA usage and they confronted him about pictures from his Facebook page showing that he had attended a friend's birthday party on Saturday, June 2, 2018 as well as pictures his wife had posted on Facebook during their vacation.  (J.R. 0047-0048 (Ex. 1) at 178:19-184:15.)  Mr. Shipton told them that his absences were due to neuropathy and that his primary issue at that time was neuropathy.  At the end of the meeting, Mr. Shipton was informed that he was indefinitely suspended with pay while the paperwork was reviewed and the investigation was completed.  (J.R. 0048 (Ex. 1) at 184:16-184:21.)

On June 26, 2018, Mr. Shipton received a call from Storck and Wolford notifying him that his employment had been terminated effective that day for "his time off and conflicting paperwork."  ((J.R. 0048-0049 (Ex. 1) at 185:11-186:12; JSOF at ¶ 26.)  He subsequently received a letter of termination stating that the basis for his termination was "misuse of sick leave."  (J.R. 0216, Exhibit 14: Letter Dated 6/26/18.)  The termination letter further stated that the investigation showed that he had "requested and taken sick leave and then submitted conflicting medical documentation."

## ARGUMENT

### I.     Defendants Are Not Entitled To Summary Judgment As To Mr. Shipton's FMLA Interference And Retaliation Claims Based On His Discharge

Defendants argue that they are entitled to summary judgment as to Mr. Shipton's FMLA claims based on the termination of his employment because "BGE terminated his employment

based on its belief that he misused his leave and submitted conflicting medical documentation." (ECF No. 42-1, Defs. Mem. at 23.)  Defendants' argument fails for two main reasons.  First, the evidence indisputably shows that Mr. Shipton never misused his FMLA leave.  Second, the "conflicting medical documentation" is not evidence of improper conduct by Mr. Shipton.

### A.      Mr. Shipton Requested And Received Approval From BGE To Use Intermittent FMLA Leave For Absences Related To Diabetes

It is undisputed that Mr. Shipton submitted the necessary paperwork to take intermittent FMLA leave related to his diabetes in or around July 2017.  (J.R. 0109-0112 (Ex. 3); J.R. 0113-0120 (Ex. 4).)  The paperwork was completed by his primary healthcare provider, Chelsey Hamershock. Ms. Hamershock is a Physician's Assistant who worked under the supervision of a physician.  (J.R. 0031 (Ex. 1) at 115:12-116:5)  By the time she completed the certification paperwork, she had been treating Mr. Shipton for approximately two years and she had treated him "many" times for his diabetes.  (J.R. 0032 (Ex. 1) at 121:1-121:17.)  Ms. Hamershock and Mr. Shipton did not discuss what he needed the certification for or what she was going to write on the certification.  (J.R. 0032-0034 (Ex. 1) at 120:19-120:21; 126:3-126:16.)  Rather, Ms. Hamershock just wrote a generalized description of the most common symptoms associated with diabetes and hypoglycemia.  (J.R. 0033 (Ex. 1) at 122:2-122:10.)  It is undisputed that on August 25, 2017 Mr. Shipton received written notice that his FMLA request had been approved.  (J.R. 0121-0122 (Ex. 5).)  It is also undisputed that Mr. Shipton submitted FMLA paperwork from Ms. Hamershock to reapply for intermittent FMLA leave in or around December 2017.  (J.R. 0127-0130 (Ex. 6); J.R. 0131-0135 (Ex. 7).)   At that time, Mr. Shipton still experienced occasional episodes of hypoglycemia. (J.R. 0036 (Ex. 1) at 134:6-134:13.)  Further, Ms. Hamershock specifically updated the paperwork to cover diabetic-related complications. J.R. 0160 (Ex. 12).)  It is undisputed that

14

on January 5, 2018 Mr. Shipton received written notice that his FMLA request had been approved. (J.R. 0136-0142 (Ex. 8).)

There is nothing in the approval paperwork stating that Mr. Shipton's FMLA approval was for hypoglycemia only.  To the contrary, the paperwork plainly indicated that he should report all absences for this condition, *i.e.,* diabetes, as FMLA leave.  Further, based on the paperwork Mr. Shipton reasonably understood that his FMLA approval covered any absences related to his diabetes, including, but not limited to, episodes of hypoglycemia, neuropathy, and severe colds and infections secondary to his diabetes.  (J.R. 0034-0036 (Ex. 1) at 126:127:10; 137:15-137:19.)

**B.**    **Mr. Shipton Was Entitled To Use FMLA Leave Requested And Approved For Diabetes For Neuropathy, Which Is A Complication Of Diabetes**

It is undisputed that Mr. Shipton was diagnosed with diabetes in or around 2003.  (J.R. 0014 (Ex. 1) at 40:16-41:2.)   As a result of his diabetes, he suffered from diabetes-related symptoms, conditions and complications, including, but not limited to, hypoglycemia or low blood sugar, hyperglycemia or elevated blood sugar, weakness and fatigue, and neuropathy, which is a common symptom or complication of diabetes in which nerves are damaged as a result of hyperglycemia or high blood sugar levels.  (J.R. 0014 (Ex. 1) at 41:3-41:21; 47:1-49:14; 49:15-50:3; J.R. 0240 (Ex. 22).)  Further, because his immune system was compromised as a result of those conditions, he was more susceptible to secondary illnesses like digestive problems, the common cold, and viruses, and he was more likely to have complications and/or a more serious case of these illnesses.  (J.R. 0014 (Ex. 1) at 92:13-93:2.)  Because it is undisputed that neuropathy is a common symptom or complication of diabetes, Mr. Shipton was plainly entitled to use FMLA leave approved for diabetes for absences related to neuropathy.

**C.    Mr. Shipton Separately Applied For And Received Approval To Take FMLA Leave For Neuropathy**

Furthermore, it is undisputed that on April 25, 2018 Mr. Shipton submitted additional paperwork from his endocrinologist, Preethi Kadambi, M.D., substantiating that he needed to use intermittent FMLA leave for diabetic neuropathy.  (J.R. 0150—0158 (Ex. 10).  The paperwork indicated that Dr. Kadambi saw Mr. Shipton on March 12, 2018 and April 26, 2018, and that she prescribed him medication.  The paperwork stated that Mr. Shipton needed the leave because he had "peripheral neuropathy with symptoms of numbness, tingling, and burning sensation" and stated that Mr. Shipton had "not had any episode of hypoglycemia since he first saw" her and that his "blood sugars ha[d] significantly improved with treatment."  It is undisputed that on May 23, 2018 Mr. Shipton received written notice that his FMLA request had been approved.  (J.R. 0231-0239 (Ex. 21).)

**D.    In 2020, Mr. Shipton Primarily Took FMLA Leave For Neuropathy And He Disclosed To BGE That He Was Using FMLA Leave For Neuropathy**

Defendants have repeatedly suggested that Mr. Shipton only belatedly claimed that his FMLA leave was taken for neuropathy after learning that "having hypoglycemia threatened his ability to qualify for a commercial driver's license he needed for his job."  (ECF 42-1 at 6.)  However, the evidence indisputably establishes that in the months leading up to Mr. Shipton's discharge he primarily took FMLA leave for neuropathy and he truthfully reported to both his immediate supervisor and the Absence Reporting Center that he had been using FMLA leave for neuropathy as far back as September 2017.  (J.R. 0240, 0247 (Ex. 22); J.R. 0260 (Ex. 23); JSOF at ¶ 17.)  He also truthfully reported to BGE OHS that his absences before he went on vacation were due to severe foot pain from diabetic neuropathy. (J.R. 0039-0040 (Ex. 1) at 148:20-150:5.)

16

He explained that he used FMLA leave for his absences due to neuropathy because he was unable to tolerate pain in his feet while standing for long periods of time. (JSOF at ¶ 18; (J.R. 0040 (Ex. 1) at 151:9-151:17.)   Further, he explained that foot pain due to diabetic neuropathy was his primary issue related to his diabetes at that time. (J.R. 0041 (Ex. 1) at 154:10-154:14.)

Defendants have not presented *any evidence* demonstrating that Mr. Shipton gave his supervisor, the Absence Reporting Center, or BGE OHS a false reason for using FMLA leave on any specific occasions.   Moreover, Defendants cannot seriously maintain that they believed Mr. Shipton was lying when he claimed that he had neuropathy when BGE's own business records confirm that he disclosed that he was using FMLA leave for nerve pain in his feet and legs as far back as September 2017.   Further, the certification paperwork from Dr. Kadambi corroborated his assertion that he sought treatment from a specialist and was formally diagnosed with neuropathy several weeks before BGE OHS notified him of any issue regarding his CDL.

### E.    That Mr. Shipton Went On Vacation After Taking FMLA Leave Is Not Inherently Suspicious

Defendants claim that *Adkins v. CSX Transportation, Inc.,* No. CV 3:18-0321, 2021 WL 3731828, at *4 (S.D.W. Va. Aug. 23, 2021) is instructive here.   *Adkins* is instructive, but it weighs against Defendants and in favor of Mr. Shipton.   In *Adkins*, in a 2-month period a group of CSX employees submitted certificates of illness from one of two chiropractors indicating that they all had soft-tissue injuries and recommending that they remain off work for eight or more weeks.   *Id.* at *1.   Around the time that the certificates of illness were submitted, CSX had announced furloughs in the area.   *Id.* at fn. 2.   CSX's Chief Medical Officer requested an investigation because "'the timing of these alleged injuries'" was "'highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers.'"   *Id.*

In this case, Mr. Shipton was required to report to BGE OHS because his supervisors, Grosscup and Woolford, purportedly "noticed that [he] took FMLA leave the three days before he was scheduled to go on vacation to Jamaica on April 7, 2018. (ECF No. 42-1 at 11 (citing J.R. 0039 (Ex. 1) at 149:21-150:2; J.R. 0221 (Ex. 16) at ¶ 9.))  However, given the particular reason Mr. Shipton took FMLA leave and the physically demanding nature of his specific job duties, as a matter of law, there was nothing inherently suspicious about the fact that he went on vacation after taking FMLA leave.

The facts of this case are on all fours with the facts in *DaPrato v. Mass. Water Res. Auth.*, 123 N.E. 3d. 737 (Mass. 2019), a recent decision from the Massachusetts Supreme Judicial Court that upheld a large jury verdict favoring an employee who was terminated after his employer discovered that he vacationed with his family in Mexico while on leave to recover from foot surgery.  DaPrato was a manager who told his employer he would need surgery on his foot. He applied for FMLA leave and submitted a doctor's note indicating that he would be out of work for four to six weeks after surgery and would transition to putting weight on his foot after four weeks. A few weeks after surgery, DaPrato asked to return from medical leave early, as he could walk with crutches and did not want to exhaust his vacation time. MWRA would not let him return without a doctor's note, which DaPrato was unable to obtain until his next scheduled appointment some weeks later. Near the end of his FMLA leave, DaPrato went on a two-week vacation in Mexico with his family.  After DaPrato returned to work, he sent an email to human resources indicating that he intended to take FMLA leave again to have knee surgery. The same day, MWRA learned that DaPrato had vacationed in Mexico while on FMLA leave. MWRA investigated, concluded that DaPrato had misrepresented his medical condition, and terminated his employment.

DaPrato sued claiming that MWRA terminated his employment in retaliation for his exercise of FMLA rights. At trial, MWRA displayed to the jury pictures of DaPrato in Mexico standing on a boat fishing and holding a large fish he caught.  But while MWRA offered these pictures to challenge DaPrato's account of his physical limitations while in Mexico, MWRA did not possess the pictures when it decided to terminate his employment.  In addition, at trial MWRA's HR director testified, "I wouldn't think somebody who's seriously ill or disabled would be able to be on a vacation."  The jury found that MWRA terminated DaPrato in retaliation for taking FMLA leave and expressing his intent to do so again. The jury awarded back pay, front pay, emotional distress damages, punitive damages and attorneys' fees, for a total judgment exceeding $2 million.

On appeal to the Massachusetts Supreme Judicial Court, MWRA contended that the lower court erred in instructing the jury that they could not consider that DaPrato "took or requested [FMLA] leave or spent time recuperating in a particular location or in a particular manner" when determining whether MWRA had a legitimate reason to terminate him.  The court acknowledged that the pictures raised "legitimate questions" about whether DaPrato was entirely truthful about the scope of his activities on vacation.  However, the court found any error was not prejudicial because the jury awarded punitive damages and, thus, the jury clearly determined that MWRA's conduct outrageous.  The court observed that, while an employer may validly consider an employee's conduct on vacation (or anywhere) that is inconsistent with the employee's stated reasons for medical leave, "[a]n employee recovering from a leg injury may sit with his or her leg raised by the sea shore while fully complying with FMLA leave requirements but may not climb Machu Picchu without abusing the FMLA process."  *Id.*  Moreover, the court explained that the statement from MWRA's HR director that an employee who is ill or disabled would not be able to

vacation was wrong as a matter of law.  123 N.E. 3d. at 749.  Accordingly, the court concluded that the trial court properly declined to give an honest belief instruction.  123 N.E. 3d. at 750.

Here, not only is there insufficient evidence to establish an honest belief defense, the evidence indisputably proves that Defendants' purported suspicions about Mr. Shipton were baseless and, in fact, the documents and information Defendants gathered and reviewed in the course of BGE's internal investigation proved that any such suspicions were unfounded because Mr. Shipton had an established history of neuropathy.  In view of the evidence indisputably showing that Mr. Shipton was entitled to take FMLA leave for neuropathy, Defendants' termination of Mr. Shipton based on the pretextual assertion that they believed he "misused" his leave plainly constituted interference with his FMLA rights that caused him harm.  *See generally Adams v. Anne Arundel Cnty. Pub. Sch.,* 789 F.3d 422, 427 (4th Cir. 2015) (to prevail on an interference claim, an employee must show: "(1) that he is entitled to an FMLA benefit; (2) his employer interfered with the provision of that benefit; and (3) that interference caused harm.").  Accordingly, Mr. Shipton is entitled to judgment as a matter of law as to his FMLA interference claim based on the termination of his employment.

## II.     There Is Ample Evidence To Trigger The 3-Year Statute Of Limitations Applicable To Willful FMLA Violations

Defendants acknowledge that the FMLA allows for the statute of limitations to be extended to three years if the employer willfully violated the FMLA. (ECF No. 42-1 at 18 (citing 29 U.S.C. § 2617(c)(2)).  The Fourth Circuit has held that an employer willfully violates the FMLA when the employer knew or showed reckless disregard for whether its conduct violated the FMLA.  *See Settle v. S.W. Rodgers Co.,* 182 F.3d 909, *3 (4th Cir. 1999).  Here, the evidence establishes that Defendants knowingly violated the FMLA

because they discharged Mr. Shipton based on the facially pretextual assertion that they believed that he had "misused" his leave when, in fact, the evidence plainly shows that he only used leave for FMLA-covered reasons.

Defendants also overlook the evidence demonstrating that Mr. Shipton's supervisor, Grosscup, was hostile to Mr. Shipton because of his use of FMLA leave.  Among other things, the evidence shows that Mr. Shipton felt pressured by Grosscup to limit or reduce the number of days he took FMLA leave.  (J.R. 0052 (Ex. 1) at 160:6-160:10; 198:13-198:19.)   The evidence shows that when Mr. Shipton returned to work from a recent absence, a coworker warned him that Grosscup had played one of his call-out messages in front of other coworkers, laughed about it, and said that Mr. Shipton should be fired.  (J.R. 0051 (Ex. 1) at 196:21-197:18.)  The evidence shows that another coworker warned Mr. Shipton that when he was absent Grosscup made comments complaining about him being "off again."  (J.R. 0053 (Ex. 1) at 203:19-205:6.) This evidence is more than sufficient to establish "willful" conduct that justifies extending the statute of limitations to three years.

WHEREFORE, Plaintiff Michael Shipton respectfully requests that the Court deny Defendants' Motion for Summary Judgment in its entirety and grant his Cross-Motion for Summary Judgment as to his FMLA interference claim based on the termination of his employment.

DATED 04/11/2022

Respectfully submitted,


_____/s/_____
Tonya Baña (Bar No. 27326)
4305 Saint Paul Street
Baltimore, MD  21218
Tel.: (443) 890-8000
Fax: (410) 670-7573
E-mail: tonya@tonyabana.com

*Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true copy of Plaintiff's Opposition to Defendants' Motion

for Summary Judgment and Cross-Motion for Summary Judgment was served as required by

Fed.R.Civ.P. 5(a) and sent electronically via ECF in accordance with LR 102.1(c) on this 11th

day of April, 2022 to:

Elena D. Marcuss (Fed. Bar No. 25547)
Adam T. Simons (Fed. Bar No. 29357)
Rebecca W. Lineberry (Fed. Bar. No. 21630)
McGuireWoods LLP
500 East Pratt Street, Suite 1000
Baltimore, Maryland 21202
410-659-4454 (phone)
410-659-4547 (fax)
emarcuss@mcguirewoods.com
asimons@mcguirewoods.com
rlineberry@mcguirewoods.com

*Counsel for Defendants*

_____/s/_____
Tonya Baña
*Attorney for Plaintiff*